## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

JEREMY STANDISH, on behalf of
himself and all others similarly situated,

        Plaintiff,

    v.

ALLWELL BEHAVIORAL HEALTH
SERVICES,

        Defendant.

Case No. 2:22-cv-2468

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

## INTRODUCTION

1. This case is *not* about an ordinary data breach. In this case, bad actors have obtained the most personal mental health details of thousands of persons. This information is of a type that is, for many people, is precisely the information about themselves that they would most wish to keep private. And now it is no longer private.

2. Although the stigma surrounding mental illness has lessened in recent years, it should be up to each individual person how and to whom they share that information, if they ever share it with anyone. Every person affected by this case has been cheated of that right.

3. Defendant Allwell Behavioral Health Services ("Allwell") is a medical services provider that collects and stores vast amounts of protected health information (PHI) and personally identifying information (PII) about its patients and employees. Allwell specializes in the treatment of mental health issues— including issues with addiction, post-traumatic stress disorder, and suicide or self-harm. *See Services*, ALLWELL BEHAVIORAL HEALTH SERVS. (accessed June 9, 2022), https://bit.ly/3MvYTU9. On March 2, 2022, according to Allwell, a third-party

gained access to Allwell's computer network. *See Allwell Notice of Data Breach* (May 20, 2022) (Exhibit 1). These wrongdoers accessed patients' "names, dates of birth, Social Security numbers, phone numbers, treatment activity, treatment provider, treatment date, treatment location, and payer information." *Id.* They also obtained employees' "name, address, date of birth, Social Security number, bank routing number, bank account number, and driver's license number." *Id.* Allwell was aware of the breach by March 5, 2022, but it said nothing until May 20, 2022. *Id.*

4. Plaintiff Jeremy Standish is a victim of the data breach. He was an Allwell patient from 2018–2019, during which time Allwell collected his PHI and PII as a condition of providing services and treatment. As a result of Allwell's failure to take reasonable precautions, wrongdoers accessed Standish's PHI and PII, thereby subjecting him to a severe invasion of privacy. Since Standish's information was exposed, criminals have compromised his bank account, filed false tax returns in his name, locked him out of his Facebook account, and inundated him with hundreds of spam phone calls and text messages every day.

5. Standish, on behalf of himself and all others similarly situated, seeks damages and equitable relief for Allwell's negligence, breach of confidence, breach of contract, and (alternatively) unjust enrichment.

**PARTIES**

6. Plaintiff Jeremy Standish is a resident of Dayton, Ohio.

7. Defendant Allwell Behavioral Health Services is a private company with its principal place of business in Zanesville, Ohio. Its headquarters is located at 2845 Bell Street, Zanesville, Ohio 43701.

**JURISDICTION AND VENUE**

8. Allwell is subject to this Court's personal jurisdiction because its principal place of business is (and at all relevant times was) located in Zanesville, Ohio.

9.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(d)(2) because at least one member[1] of the proposed Class is a citizen of a state different from that of Allwell; the amount in controversy exceeds $5,000,000, exclusive of interest and costs; the proposed Class consists of more than 100 class members, and none of the exceptions under the subsection apply to this action.

10.    Venue is proper in the Southern District of Ohio, Eastern Division because a substantial part of the events and omissions giving rise to this claim occurred in Muskingum and Coshocton Counties. *See* 28 U.S.C. § 1391(b)(2); S.D. OHIO CIV. R. 82.1(b)–(d). Specifically, Allwell's headquarters is located in Muskingum County where, on information and belief, it made the relevant decisions giving rise to the data breach, and Allwell collected Standish's personal medical information when he obtained treatment at Allwell's Coshocton location.

**FACTUAL ALLEGATIONS**

**A.     Allwell collects sensitive data about its patients and employees.**

11.    Allwell is a private company that offers mental health services from its locations in Coshocton, Guernsey, Morgan, Muskingum, Noble and Perry counties.

12.    Those mental health services include treatment for Attention Deficit Hyperactivity Disorder; abuse, Post-Traumatic Stress Disorder, and trauma; Bipolar Disorder; addiction; anger management; anxiety; depression; child and adolescent issues; family and relationship issues; grief or loss; stress; suicide and

---

[1] WellCare submitted data breach notifications indicating that two citizens from Maine, Massachusetts, and Montana were affected by the breach. *See* Office of Maine Attorney General, *Data Breach Notifications* (May 23, 2022), https://bit.ly/3O6fUVU; Massachusetts Office of Consumer Affairs and Business Regulation, *Data Breach Notification Report* at 44 (2022), https://bit.ly/3mw5OBU; Montana Department of Justice, *Reported Data Breach Incidents* (accessed June 9, 2022), https://bit.ly/3H663x8. On information and belief, the Class includes residents of other states as well.

self-injury; and uncharacteristic behavior or psychosis. *Services*, ALLWELL BEHAVIORAL HEALTH SERVS. (accessed June 9, 2022), https://bit.ly/3MvYTU9.

13.    In connection with those mental health services, Allwell creates and stores PHI concerning its patients. This PHI includes information about treatment that patients received, such as the treatment activity, the treatment provider, the date of treatment, where the treatment took place, and payer information. *Data Breach Notification*, Exhibit 1.

14.    Allwell also creates and stores PII concerning its patients. This PII includes names, dates of birth, social security numbers, and phone numbers. *Id.*

15.    Allwell maintains a computerized quality assurance system. *Id.*

16.    In its quality assurance system, Allwell stores its patients' PHI together with their PII. *Id.*

**B.    The foreseeable likelihood and severity of a data breach was significant**

17.    Given the type of data Allwell collected and stored, it was highly foreseeable that bad actors would attempt to access Allwell's systems.

18.    "[H]ackers are likely to be drawn to databases containing information which has a high value on secondary black markets," such as "identifying and financial data" or "intimate and health-related data." Mark Verstraete & Tal Zarsky, *Optimizing Breach Notification*, 2021 U. ILL. L. REV. 803, 854–55 (2021). Consequently, "relevant and rational firms should engage in greater security investment and reduced collection—all steps to limit the prospects of a potential breach and subsequent notification." *Id.* at 855.

19.    Companies in the healthcare industry frequently create and store identifying, financial, and health-related data.

20.    Perhaps unsurprisingly, then, "the healthcare industry has faced the highest number of [data] breaches among all industries." Adil Hussain Seh, et al.,

*Healthcare Data Breaches: Insights and Implications*, 8 HEALTHCARE 133, 2 (2020), https://bit.ly/3QcL4Ng.

21.　　Data breaches are a well-known threat in the healthcare industry. According to the American Medical Association, "cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care."  Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, AM. MED. ASS'N (Oct. 4, 2019), https://bit.ly/3mKAf7O.

22.　　Allwell's stored financial, identifying, and health-related information on its systems.

23.　　Therefore, it was highly foreseeable that a bad actor would seek to access data concerning Standish and the Class that was stored on Allwell's systems.

**C.　　As a result of Allwell's failure to implement reasonable data security practices, cybercriminals accessed PHI, PII, and financial information regarding patients.**

24.　　On March 2, 2022, an unauthorized person gained access to the PHI, PII, and financial information stored on Allwell's system. *Notice of Data Breach*, Ex. 1.

25.　　The wrongdoer accessed patient's PHI and PII stored in Allwell's quality assurance system, including "names, dates of birth, Social Security numbers, phone numbers, treatment activity, treatment provider, treatment date, treatment location, and payer information." *Id.*

26.　　Because this data breach targeted personal information, it is reasonable to infer that the hackers will use victims' data for fraudulent purposes. Indeed, this has happened to Plaintiff.

27.　　Allwell discovered the data breach after three days, but did not inform the victims at that time. *Id.*

28.     "In late April 2022," Allwell's investigation determined that an "unauthorized party" had taken "client information from the computer system." *Id.* Allwell still did not notify the public at that time.

29.     On May 20, 2022—two and a half months after it learned of the breach—Allwell finally posted a public notice. *Id.* Three days later, Allwell began sending notification letters to victims of the breach. *Id.*

30.     The delay between when Allwell's discovery and public disclosure of the breach was unreasonable under the circumstances because Allwell knew or should have known that victims of the breach could not protect themselves from further harm until they were notified.

31.     The notification letter states that Allwell has "upgraded [its] information technology and computer systems to provide additional security to protect against further unauthorized access." *Id.* Of course, this was too late to prevent the injuries that had already occurred.

32.     Allwell has acknowledged the severe risk of harm by offering one to two years of credit monitoring, a $1,000,000 insurance policy, and an identity theft recovery service. *Id.*

33.     On information and belief, Allwell failed to adequately train its employees on even the basic cybersecurity protocols, including:

   a.  Effective password management and encryption protocols, including, but not limited to, the use of multi-factor authentication for all users;

   b.  Locking, encrypting and limiting access to computers and files containing sensitive information;

   c.  Implementing guidelines for maintaining and communicating sensitive data;

   d.  Protecting sensitive patient information, including personal and financial information, by implementing protocols on how to request and respond to requests for the transfer of such

information and how to securely send such information through a secure file transfer system to only known recipients; and

e. Providing focused cybersecurity awareness training programs for employees.

34.    The FTC has noted the need to factor data security into all business decision-making. *Start With Security, A Guide for Business*, FTC (accessed June 9, 2022), https://bit.ly/3mHCGYz. According to the FTC, data security requires: (1) encrypting information stored on computer networks; (2) retaining payment card information only as long as necessary; (3) properly disposing of personal information that is no longer needed; (4) limiting administrative access to business systems; (5) using industry-tested and accepted methods for securing data; (6) monitoring activity on networks to uncover unapproved activity; (7) verifying that privacy and security features function properly; (8) testing for common vulnerabilities; and (9) updating and patching third-party software. *Id.*

35.    To that end, the FTC has issued orders against businesses that failed to employ reasonable measures to secure sensitive payment card data. *See In the matter of Lookout Services, Inc.*, No. C-4326, ¶ 7 (June 15, 2011) ("[Defendant] allowed users to bypass authentication procedures" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks, such as employing an intrusion detection system and monitoring system logs."); *In the matter of DSW, Inc.*, No. C-4157, ¶ 7 (Mar. 7, 2006) ("[Defendant] failed to employ sufficient measures to detect unauthorized access."); *In the matter of The TJX Cos., Inc.*, No. C-4227 (Jul. 29, 2008) ("[R]espondent stored . . . personal information obtained to verify checks and process unreceipted returns in clear text on its in-store and corporate networks[,]" "did not require network administrators . . . to use different passwords to access different programs, computers, and networks[,]" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks . . ."); *In the matter of Dave & Buster's Inc.*, No. C-4291 (May 20,

2010) ("[Defendant] failed to monitor and filter outbound traffic from its networks to identify and block export of sensitive personal information without authorization" and "failed to use readily available security measures to limit access between instore networks . . ."). These orders, which all preceded the data breach, further clarify the measures businesses must take to meet their data security obligations.

36.     On information and belief, Allwell's use of outdated and insecure computer systems and software that are easy to hack, and its failure to maintain adequate security measures and an up-to-date technology security strategy, demonstrates a willful and conscious disregard for privacy, and has exposed the PHI of Plaintiff and thousands of members of the proposed Class to unscrupulous operators, con artists, and outright criminals.

37.     Allwell violated its obligation to implement best practices and comply with industry standards concerning computer system security. Allwell failed to comply with security standards and allowed its patients' PHI, PII and financial information to be accessed and stolen by failing to implement security measures that could have prevented or mitigated the data breach

**D.     Standish's information was exposed in the data breach.**

38.     Jeremy Standish was an Allwell patient from 2018–2019, and Allwell created records of his PHI and PII during that time.

39.     Allwell requires Standish to provide his PHI and PII as a condition of receiving services and Treatment from Allwell.

40.     Standish believed, as part of the payments to Allwell for treatment and services, that those payments included amounts for data security. Had Standish known that Allwell did not utilize reasonable data security measures, he would have paid less for those treatments and services or sought them elsewhere.

41. Standish received a data breach notification from Allwell informing him that his PHI and PII had been exposed during the breach.

42. Therefore, a third-party has accessed Standish's PHI and PII without his permission.

43. In March 2022—around the same time the data breach occurred—Huntington Bank alerted Standish of a fraudulent attempt to withdraw $89.95 from his account.

44. A hacker also obtained access to Standish's Facebook account after the breach occurred. The hacker then changed the phone number and password on the account to prevent Standish from regaining access.

45. After the breach occurred, an unknown person filed a tax return in Standish's name, which the IRS recognizes as a sign of identity theft. *See Taxpayer Guide to Identity Theft*, IRS (accessed June 9, 2022), https://bit.ly/3b03DV2.

46. In addition, Standish began receiving hundreds of spam phone calls and text messages after the data breach, which shows that his information has been sold without his permission.

47. None of this would have occurred if Allwell had implemented reasonable data security practices.

**E. Standish and the Class suffered concrete injuries as a result of Allwell's negligence.**

48. Standish and the Class suffered at least six concrete injuries as a direct and proximate result of their information being exposed.

**1. Invasion of Privacy**

49. *First*, Standish and the Class suffered an invasion of privacy.

50. When it comes a breach of PHI, an injury *has already occurred* because the victim inherently suffered a privacy injury. That is especially true here when the PHI is about mental health issues.

51. Privacy injuries are concrete. As Justice Brandeis once observed, an invasion of privacy can subject victims "to mental pain and distress, far greater than could be inflicted by mere bodily injury." Louis D. Brandeis & Samuel D. Warren, *The Right to Privacy*, 4 HARV. L. REV. 193, 196 (1890).

52. Medical data breaches cause privacy injuries because they expose inherently private information to the public without consent. Indeed, "[p]atients are highly sensitive to disclosure of their health information," particularly because PHI "often involves intimate and personal facts, with a heavy emotional overlay." Peter A. Winn, *Confidentiality in Cyberspace: The HIPAA Privacy Rules and the Common Law*, 33 RUTGERS L.J. 617, 621 (2002). Unsurprisingly, then, empirical evidence demonstrates that "[w]hen asked, the overwhelming majority of American patients express concern about the privacy of their medical records." Sharona Hoffman & Andy Podgurski, *E-Health Hazards: Provider Liability and Electronic Health Record Systems*, 24 BERKLEY TECH. L.J. 1523, 1557 (2009).

53. The PHI exposed in this case involved treatment for mental health issues. This information is highly sensitive, and Standish's privacy was invaded when his PHI was accessed without his permission.

54. Standish—like any reasonable person similarly situated—experienced extreme distress and anxiety upon learning that his privacy had been invaded in this manner.

### 2. Identity Theft

55. *Second*, Standish and the Class have suffered and will suffer injuries due to identity theft.

56.     As described above, Standish was subjected to fraudulent bank charges, takeovers of his Facebook account, tax returns wrongly filed in his name, and spam phone calls and text messages following the data breach.

57.     Therefore, Standish has already been the victim of identity theft.

58.     Given the close connection in time and the apparent motive of the hackers, it is reasonable to infer that those instances of identity theft were caused by the data breach.

59.     Standish and the Class are also at a significant risk of future identity theft.

60.     According to experts, one out of four data breach notification recipients become a victim of identity fraud. *Study Shows One in Four Who Receive Data Breach Letter Become Fraud Victims*, THREATPOST.COM (Feb. 21, 2013), https://bit.ly/3zB8Uwv.

61.     Stolen PHI is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PHI can be worth up to $1,000.00 depending on the type of information obtained. *See* Brian Stack, *Here's How Much Your Personal Information is Selling for on the Dark Web*, EXPERIAN (Dec. 15, 2017), https://bit.ly/2Ox2SGY.

62.     The value of Plaintiff's and the proposed Class's PHI on the black market is considerable. Stolen PHI trades on the black market for years, and criminals frequently post stolen private information openly and directly on various "dark web" internet websites, making the information publicly available, for a substantial fee of course.

63.     It can take victims years to spot identity or PHI theft, giving criminals plenty of time to milk that information for cash.

64.     One such example of criminals using PHI for profit is the development of "Fullz" packages. "Fullz" is fraudster speak for data that includes the information

of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record or more on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz", which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records For Sale in Underground Stolen From Texas Life Insurance Firm*, KREBS ON SECURITY (Sep. 18, 2014), https://bit.ly/3Qj2eJd.

65. Cyber-criminals can cross-reference two sources of PHI to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

66. The development of "Fullz" packages means that stolen PHI from the data breach can easily be used to link and identify it to Plaintiff's and the proposed Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PHI stolen by the cyber-criminals in the data breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and members of the proposed Class, and it is reasonable for any trier of fact,

including this Court or a jury, to find that Plaintiff's and other members of the proposed Class's stolen PHI is being misused, and that such misuse is fairly traceable to the data breach.

67. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.

68. Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good." Defendant did not rapidly report to Plaintiff and the Class that their PHI had been stolen.

69. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

70. In addition to out-of-pocket expenses that can exceed thousands of dollars for the victim of new account identity theft, and the emotional toll identity theft can take, some victims have to spend a considerable time repairing the damage caused by theft of their PHI. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

71. Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PHI. To protect themselves, Plaintiff and the Class will need to be remain vigilant against unauthorized data use for years or even decades to come.

### 3. Loss of Time

72. *Third*, Standish and the Class have been forced to spend time responding to the data breach.

73. Standish has spent hours responding to fraudulent bank charges, takeovers of his Facebook account, tax returns wrongly filed in his name, and spam phone calls and text messages.

74. Standish has also retained counsel to pursue this matter, which necessarily took up more of his time, and was reasonably necessary to respond to the breach.

75. Standish and the Class also spent time reviewing the data breach notification.

76. Standish and the Class are likely to spend more time responding to the data breach in the future, particularly in light of the severe risk of future identity theft.

### 4. Diminished Value of Personal Information

77. *Fourth*, the breach has diminished the value of Standish and the Class's personal information.

78. The Federal Trade Commission ("FTC") has also recognized that consumer data is a new and valuable) form of currency. In a FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency." *Statement of FTC Commissioner Pamela Jones Harbour— Remarks Before FTC Exploring Privacy Roundtable*, FTC (Dec. 7, 2009), https://bit.ly/3xKfzmu.

79. Standish and the Class's information has already been accessed by criminals, which decreases its utility.

80. Because Standish's information has already been sold by the hackers, there are now fewer buyers in the market for his information than there were before the breach.

81. Therefore, the value of Standish and the Class's personal information was reduced by the data breach.

### 5. Mitigation Damages

82. *Fifth*, Allwell's failure to notify Standish and the Class of the breach within a reasonable time prevented them from mitigating further damages.

83. If Standish and the Class had known about the above injuries sooner, they could have taken precautions to protect themselves from future damages.

84. Because they were delayed from taking protective measures, Standish and the Class are now at a greater risk than if they had been able to take precautions.

### 6. Benefit of the Bargain

85. *Sixth*, Standish and the Class were denied the benefit of their bargain with Allwell.

86. Standish and the Class accepted and paid for medical treatment offered by Allwell.

87. Allwell will only provide medical treatment to patients who agree to provide PHI and PII.

88. Standish and the Class provided Allwell with their PHI and PII.

89. Allwell impliedly promised that it would take reasonable precautions to safeguard that PHI and PII, and that it would notify Standish and the Class within a reasonable time in the event of a data breach.

90.     Allwell did not take reasonable precautions to safeguard Standish and the Class's PHI and PII, and it did not notify them of the data breach within a reasonable time.

91.     Therefore, Standish and the Class were denied the benefit of their bargain with Allwell.

## CLASS ACTION ALLEGATIONS

92.     Pursuant to FED. R. CIV. P. 23(b)(3), Plaintiff seeks certification of a class defined as follows:

> Every Allwell patient whose information was accessed by a third-party in connection with the data breach that occurred on or about March 2, 2022.

93.     Excluded from the Class are: (a) Allwell and its officers, directors, legal representatives, successors and wholly or partly owned subsidiaries or affiliated companies; (b) class counsel and their employees; and (c) the judicial officers and their immediate family members and associated court staff assigned to this case.

94.     *Ascertainability.* The Class can be readily identified through Allwell's records, which is demonstrated by the fact that Allwell has already identified the class members and notified them of the breach. *Notice of Data Breach*, Exhibit 1.

95.     *Numerosity.* Approximately 30,000 Allwell patients had their information exposed in the breach. Giles Bruce, *Ohio data breach affects nearly 30,000 patients*, BECKER'S HOSP. REV. (May 31, 2022), https://bit.ly/3tqFhKt. Therefore, the Class is so numerous that individual joinder is impracticable.

96.     *Typicality.* Plaintiff's claims are typical of the Class he seeks to represent. Like all class members, Plaintiff's personal information was exposed in the data breach as a result of Allwell's failure to implement reasonable data security measures. Thus, Plaintiff's claims arise out of the same conduct and are based on the same legal theories as those of the absent class members.

97. *Adequacy of Class Representative.* Plaintiff will fairly and adequately protect the interests of the Class. He is aware of his fiduciary duties to absent class members and is determined to faithfully discharge his responsibility. Plaintiff's interests are aligned with (and not antagonistic to) the interests of the Class.

98. *Adequacy of Counsel.* In addition, Plaintiff has retained competent counsel with considerable experience in class action and other complex litigation, including data breach cases. Plaintiff's counsel have done substantial work in identifying and investigating potential claims in this action, have considerable knowledge of the applicable law, and will devote the time and financial resources necessary to vigorously prosecute this action. They do not have any interests adverse to the Class.

99. *Commonality and Predominance.* This case presents numerous questions of law and fact with answers common to the Class that predominate over questions affecting only individual class members. Those common questions include:

     a. Whether Defendant had a duty to use reasonable care to safeguard Plaintiff and the Class's PHI;

     b. Whether Defendant breached the duty to use reasonable care to safeguard the Class's PHI;

     c. Whether Defendant breached its contractual promises to safeguard Plaintiff and the Class's PHI;

     d. Whether Defendant knew or should have known about the inadequacies of its data security policies and system and the dangers associated with storing sensitive PHI and PII;

     e. Whether Defendant failed to use reasonable care and commercially reasonable methods to safeguard and protect Plaintiff and the Class's PHI and PII from unauthorized release and disclosure;

     f. Whether the proper data security measures, policies, procedures, and protocols were in place and operational within Defendant's computer systems to safeguard and protect Plaintiff

and the Class's PHI and PII from unauthorized release and disclosure;

g. Whether the data breach was caused by Defendant's inadequate cybersecurity measures, policies, procedures, and protocols;

h. Whether Defendant took reasonable measures to determine the extent of the data breach after it was discovered;

i. Whether Defendant's delay in informing Plaintiff and the Class of the data breach was unreasonable;

j. Whether Defendant's method of informing Plaintiff and other the Class of the data breach was unreasonable;

k. Whether Defendant is liable for negligence, gross negligence, or recklessness;

l. Whether Defendant's conduct, practices, statements, and representations about the data breach of the PHI and PII violated applicable state laws;

m. Whether Plaintiff and the Class were injured as a proximate cause or result of the data breach;

n. Whether Plaintiff and the Class were damaged as a proximate cause or result of Defendant's breach of its contract with Plaintiff and the Class;

o. Whether Defendant's practices and representations related to the data breach breached implied warranties;

p. What the proper measure of damages is; and

q. Whether Plaintiff and the Class are entitled to restitutionary, injunctive, declaratory, or other relief.

100. *Superiority and Manageability*. A class action is superior to individual adjudications because joinder of all class members is impracticable, would create a risk of inconsistent or varying adjudications, and would impose an enormous burden on the judicial system. The amount-in-controversy for each individual class member is likely relatively small, which reinforces the superiority of representative litigation. As such, a class action presents far fewer management difficulties than individual adjudications, preserves the resources of the parties and the judiciary, and protects the rights of each class member.

## CAUSES OF ACTION

### Count 1: Negligence

101. Plaintiff incorporates by reference all of the above allegations.

102. Plaintiff and the Class entrusted their PHI and PII to Defendant. Defendant owed to Plaintiff and other the Class a duty to exercise reasonable care in handling and using the PHI and PII in its care and custody, including implementing industry-standard security procedures sufficient to reasonably protect the information from the data breach, theft, and unauthorized use that came to pass, and to promptly detect attempts at unauthorized access.

103. Defendant owed a duty of care to Plaintiff and the Class because it was foreseeable that Defendant's failure to adequately safeguard their PHI and PII in accordance with state-of-the-art industry standards concerning data security would result in the compromise of that PHI and PII—just like the data breach that ultimately came to pass. Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiff and the Class's PHI and PII failing to properly supervise both the manner in which the PHI was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

104. Defendant owed to Plaintiff and the Class a duty to notify them within a reasonable time frame of any breach to the security of their PHI. Defendant also owed a duty to timely and accurately disclose to Plaintiff and the Class the scope, nature, and occurrence of the data breach. This duty is necessary in order for Plaintiff and the Class to take appropriate measures to protect their PHI and PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps in an effort to mitigate the harm caused by the data breach.

105. Defendant owed these duties to Plaintiff and the Class because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's

inadequate security protocols. Defendant actively sought and obtained Plaintiff and the Class's personal and financial information and PHI and PII for medical treatment services. Plaintiff and the Class were required to provide their personal information and PHI and PII to Defendant in order to receive medical treatment and services from Defendant, and Defendant retained that information.

106. The risk that unauthorized persons would attempt to gain access to the PHI and PII and misuse it was foreseeable. Given that Defendant holds vast amounts of PHI and PII, it was inevitable that unauthorized individuals would attempt to access Defendant's databases containing the PHI and PII.

107. PHI and PII is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PHI and PII of Plaintiff and the Class and the importance of exercising reasonable care in handling it.

108. Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PHI and PII of Plaintiff and the Class which actually and proximately caused the data breach and Plaintiff and the Class's injury. Defendant further breached its duties by failing to provide reasonably timely notice of the data breach to Plaintiff and the Class, which actually and proximately caused and exacerbated the harm from the data breach and Plaintiff and the Class's injuries-in-fact.

109. Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiff and the Class's actual, tangible, injury-in-fact and damages, including, without limitation, theft of their PHI by criminals, improper disclosure of their PHI, lost benefit of their bargain, lost value of their PHI, and lost time and money incurred to mitigate and remediate the effects of the data breach that resulted from and were

caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

## Count 2: Negligence Per Se

110. Plaintiff incorporates by reference all of the above allegations.

111. Defendant is a "business entity" that maintains, stores, or manages computerized data that includes "personal information" as defined by R.C. § 1349.19(A).

112. Plaintiff and the Class's PHI includes "personal information" as defined by R.C. § 1349.19(A).

113. Defendant was aware of a breach of its computer system that it believed or reasonably should have believed had caused or would cause loss or injury.

114. Defendant had an obligation to disclose the data breach to Plaintiff and the Class in a timely fashion as mandated by R.C. §§ 1349.19(B)(1)-(2).

115. Defendant had a duty to Plaintiff and the Class to implement and maintain reasonable security procedures and practices to safeguard Plaintiff and the Class's PHI and to notify Plaintiff and the Class if the security of their PHI was compromised.

116. Defendant breached its duties to Plaintiff and the Class under R.C. §§ 1349.19(B)(1)-(2) by failing to provide fair, reasonable, adequate, or timely notice of the data breach to Plaintiff and the Class.

117. Defendant's failure to disclose the data breach in a timely manner as required by R.C. § 1349.19(B) constitutes negligence per se.

118. As a direct and proximate cause of Defendant's negligence in failing to timely notify them of the data breach, in violation of R.C. § 1349.19(B), Plaintiff and the Class sustained actual losses and damages as described in this complaint.

119.    Defendant is also a health care provider who transmits health information in electric form and therefore is a "covered entity" under HIPAA. 45 C.F.R. § 160.103.

120.    As a covered entity, Defendant is subject to the Data Breach Notification Rule. 45 C.F.R. § 164.404(a)(1).

121.    This data breach exposed unsecured protected health information.

122.    Defendant owed a duty to provide individual notice of that breach "without unreasonable delay and in no case later than 60 calendar days after discovery of a breach. 45 C.F.R. § 164.404(b).

123.    Defendant claims to have discovered the breach on March 5, 2022, but it did not notify affected individuals until May 20, 2022—a delay of 76 days.

124.    This delay was unreasonable under the circumstances.

125.    The Data Breach Notification Rule reveals the proper standard of care for an entity such as Defendant with respect to notification for data breaches such as this one.

126.    Defendant failed to meet that standard of care.

127.    As a direct and proximate result, Plaintiff suffered actual losses and damages.

### Count 3: Breach of Confidence – "*Biddle*" Claim

128.    Plaintiff incorporates by reference all of the above allegations.

129.    Under Ohio law, "an independent tort exists for the unauthorized, unprivileged disclosure to a third party of nonpublic medical information that a physician or hospital has learned within a physician-patient relationship." *Biddle v. Warren Gen. Hosp.*, 715 N.E.2d 518, 523 (Ohio 1999).

130.    Allwell collected medical information from Plaintiff and the Class in connection with their patient-physician relationship.

131.    This information was non-public and, indeed, highly confidential.

132.    Plaintiff and the Class were unable to protect the data they had entrusted to Allwell, and thus were in a relationship of dependence and trust.

133.    A third-party obtained that medical information from Allwell's systems.

134.    That third-party was only able to access Plaintiff and the Class's medical information because Allwell recklessly disregarded its duty to preserve the confidentiality of its patients' medical information.

135.    Plaintiff and the Class suffered damages as a direct and proximate result of Defendant's breach of confidence.

### Count 4: Breach of Contract

136.    Plaintiff incorporates by reference paragraphs 1–100 of this complaint.

137.    Defendant offered to provide goods and services to Plaintiff and the Class in exchange for payment.

138.    Defendant also required Plaintiff and the Class to provide Defendant with their PHI in order to receive goods and services.

139.    In turn, Defendant impliedly promised to maintain safeguards to protect its patients' PHI and PII and to notify Plaintiff and the Class within a reasonable time if there was a breach.

140.    Plaintiff and the Class accepted Defendant's offer by providing PHI and PII to Defendant in exchange for receiving Defendant's goods and services and then by paying for and receiving the same.

141.    Implicit in the parties' agreement was that Defendant would provide Plaintiff and the Class with prompt and adequate notice of any and all unauthorized access or theft of their PHI or PII.

142.    Plaintiff and the Class would not have entrusted their PHI to Defendant in the absence of such agreement with Defendant or if they had known that Defendant would not adequately protect it.

143. Defendant materially breached the contract(s) it had entered with Plaintiff and the Class by failing to safeguard such information and failing to notify them promptly of the intrusion into its computer systems that compromised such information. Defendant further breached the implied contracts with Plaintiff and the Class by:

    a. Failing to properly safeguard and protect Plaintiff and the Class's PHI and PII;

    b. Failing to comply with industry standards as well as legal obligations that are necessarily incorporated into the parties' agreement; and

    c. Failing to ensure the confidentiality and integrity of electronic PHI that Defendant created, received, maintained, and transmitted in violation of 45 C.F.R. § 164.306(a)(1)

144. The damages sustained by Plaintiff and the Class as described above were the direct and proximate result of Defendant's material breaches of its agreement(s).

145. Plaintiff and the Class have performed as required under the relevant agreements, or such performance was waived by the conduct of Defendant.

146. The covenant of good faith and fair dealing is an element of every contract. All such contracts impose upon each party a duty of good faith and fair dealing. The parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

147. Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith

may be overt or may consist of inaction, and fair dealing may require more than honesty.

148. Defendant failed to advise Plaintiff and the Class of the data breach promptly and sufficiently.

149. Defendant also failed to provide adequate data security, even though it knew that Plaintiff and the Class understood Defendant would safeguard their PHI and would not have provided their PHI to Defendant absent such understanding.

150. In these and other ways, Defendant violated its duty of good faith and fair dealing.

151. Plaintiff and the Class have sustained damages as a result of Defendant's breaches of the agreement.

### Count 5: Unjust Enrichment

### (In the Alternative to Count 4)

152. Plaintiff incorporates by reference paragraphs 1–103 of this complaint.

153. This claim is pleaded in the alternative to the breach of implied contractual duty claim.

154. Plaintiff and the Class conferred a monetary benefit upon Defendant in the form of monies paid for treatment services.

155. Defendant appreciated or had knowledge of the benefits conferred upon itself by Plaintiff and the Class. Defendant also benefited from the receipt of Plaintiff and the Class's PHI, as this was used to facilitate payment and treatment services.

156. As a result of Defendant's conduct, Plaintiff and the Class suffered actual damages in an amount equal to the difference in value between their purchases made with reasonable data privacy and security practices and procedures that Plaintiff and the Class paid for, and those purchases without unreasonable data privacy and security practices and procedures that they received.

157.    Under principals of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and the Class because Defendant failed to implement (or adequately implement) the data privacy and security practices and procedures for itself that Plaintiff and the Class paid for and were otherwise mandated by federal, state, and local laws and industry standards.

158.    Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and the Class all unlawful or inequitable proceeds received by it as a result of the conduct and Data Breach alleged herein.

## PRAYER FOR RELIEF

159.    Plaintiff, individually and on behalf of all others similarly situated, hereby demands:

    a.  Certification of the proposed Class;

    b.  Appointment of the undersigned counsel as class counsel;

    c.  An award of all damages, including attorneys' fees and reimbursement of litigation expenses, recoverable under applicable law;

    d.  Restitution or disgorgement of all ill-gotten gains; and

    e.  Such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

160.    Plaintiff demands a jury trial on all applicable claims.

Respectfully submitted,

By: /s/ *Matthew R. Wilson*

MEYER WILSON CO., LPA
Matthew R. Wilson (72925)
*Trial Attorney*
Email: mwilson@meyerwilson.com
Michael J. Boyle, Jr. (91162)
Email: mboyle@meyerwilson.com
Jared W. Connors (101451)

Email: jconnors@meyerwilson.com
305 W. Nationwide Blvd.
Columbus, Ohio 43215
Telephone: (614) 224-6000
Facsimile: (614) 224-6066

TURKE & STRAUSS LLP
Samuel J. Strauss (*pro hac vice* to be filed)
sam@turkestrauss.com
Raina Borrelli (*pro hac vice* to be filed)
raina@turkestrauss.com
613 Williamson St., #201
Madison, WI 53703
P: (608) 237-1775

*Counsel for Plaintiff and the Proposed Class*